# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5684 | **DATE** | 12/5/2002 |
| **CASE TITLE** | Rush Beverage Company, Inc. vs. South Beach Beverage Co., Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment is granted as to all counts of plaintiff's complaint. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | | Document Number |
|---|---|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | number of notices | | | |
| | No notices required. | | | DEC 6 - 2002 | | | |
| | Notices mailed by judge's staff. | | | date docketed | | | |
| | Notified counsel by telephone. | | | | | | 88 |
| | Docketing to mail notices. | | | docketing deputy initials | | | |
| ✓ | Mail AO 450 form. | | U.S. DISTRICT COURT | | | | |
| | Copy to judge/magistrate judge. | CLERK | | date mailed notice | | | |
| SLB | courtroom deputy's initials | 02 DEC -5 PM 12: 58 | Date/time received in central Clerk's Office | mailing deputy initials | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DEC 6 - 2002

| | |
|---|---|
| RUSH BEVERAGE COMPANY, INC. ) | |
| ) | Case No. 01 C 5684 |
| Plaintiff, ) | |
| ) | Honorable John W. Darrah |
| v. ) | |
| ) | |
| SOUTH BEACH BEVERAGE ) | |
| COMPANY, INC. and ) | |
| PEPSIAMERICAS, INC., ) | |
| ) | |
| Defendants. ) | |
| ——————————————) | |
| ) | |
| SOUTH BEACH BEVERAGE ) | |
| COMPANY, INC., ) | |
| ) | |
| Counter-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| RUSH BEVERAGE COMPANY, INC. ) | |
| and R.J. CORR NATURALS, INC., ) | |
| ) | |
| Counter-Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rush Beverage Company, Inc. ("RBC"), filed a five-count amended complaint

against Defendants, South Beach Beverage Company, Inc. ("South Beach") and PepsiAmericas, Inc.

("PepsiAmericas"), alleging breach of contract (Count B); common law trademark infringement and

unfair competition (Count C); violation of the Illinois Deceptive Trade Practices Act, 815 Ill. Comp.

Stat. 510/1 *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill.

Comp. Stat. 505/1 *et seq.* (Count D); and violation of section 43(a) of the Lanham Act, 15 U.S.C.



§ 1125(a) (Count E). The amended complaint also seeks a declaration that the contract between RBC and South Beach is null and void (Count A).

South Beach and PepsiAmericas move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726,

731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts[1] (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

RBC is a corporation organized and existing under the laws of Illinois with its principal place of business in Blue Island, Illinois. (Def.'s 56.1 ¶ 1.) Robert J. Corr ("Corr") is the president of RBC and R.J. Corr Naturals, Inc. (Def.'s 56.1 ¶¶ 2, 4.) RBC is a small beverage company, marketing and selling soft drinks and energy drinks under the mark "Ginseng Rush". (Pl.'s 56.1 § B.) RBC, and its predecessor, have distributed its beverages, retail and wholesale, since 1978. (*Id.*) Its beverages have been sold in all fifty states, Canada, the Caribbean and Puerto Rico. (*Id.*) RBC owns several trademarks that incorporate the word "rush". (*Id.*)

South Beach is a Delaware corporation with its principal place of business in Norwalk, Connecticut. (Def.'s 56.1 ¶ 5.) It is the successor in interest to South Beach Beverage Company, LLC, a Connecticut limited liability company. (*Id.*) South Beach is the maker of herbally enhanced beverages that are marketed under the "SoBe" brand name and distributed in the United States and around the world. (*Id.* ¶ 6.) South Beach is recognized as the leader in the non-carbonated alternative beverage (energy and botanical drinks) market. (*Id.*; Pl.'s 56.1 § C.) For the past several years, the "SoBe" brand has been the fastest growing brand in that market. (Def.'s 56.1 ¶ 6.) South Beach

---

[1]RBC did not file a response to Defendants' Statement of Undisputed Material Facts. Therefore, these paragraphs are deemed as admitted.

markets and sells ten distinct product lines under the "SoBe" brand, totaling more than thirty different products. (*Id.* ¶ 7.) South Beach owns a number of federal trademark registrations for marks incorporating "SoBe" for use in connection with beverages. (*Id.* ¶ 7.) South Beach also owns trademark rights in its "Battling Lizards" logo. (*Id.* ¶ 7.)

In or about June 2000, South Beach LLC began developing a new energy drink known as "Adrenaline Rush". (*Id.* ¶ 8.) On September 6, 2000, South Beach LLC received a letter from Corr, alleging that South Beach LLC's use of "Adrenaline Rush" in connection with beverage products would lead to consumer confusion with R.J. Corr's "Rush" trademarks and demanding that South Beach LLC cease all further use of "Adrenaline Rush". (*Id.* ¶ 9.) An investigation revealed that Corr had greatly overstated his company's rights in the "Rush" mark. (*Id.* ¶ 10.)

In an effort to avoid the burden and expense of a federal court lawsuit for trademark infringement, South Beach LLC negotiated an amicable resolution with R.J. Corr. (*Id.* ¶ 10.) During the course of negotiation, on September 20, 2000, Corr sent Gregory Battersby ("Battersby"), counsel for South Beach LLC, copies of prior licensing agreements for the "Rush" mark with the Quaker Oats Company, BCB Beverages/Cott and National Beverage Corportation, as well as a draft license for the "SoBe Adrenaline Rush" mark for South Beach LLC's consideration. (Battersby Decl. ¶ 5.) When Battersby informed Corr that South Beach LLC would consider the matter at its convenience, Corr stated in a letter dated September 21, 2000, as follows.

> During our conversation this morning you mentioned that your client's response to the trademark infringement of Adrenaline RUSH on our RUSH marks would probably be at their convenience. I find this unacceptable. We are aware that the cans for Adrenaline RUSH have already been printed so the launch of the product is imminent. Therefore, we want this resolved by the end of next week and will give your client until noon CDT, Friday, September 29 to commit to a definitive Licensing Agreement for the use of our RUSH mark on SoBe's Adrenaline RUSH. Should that

commitment not be made by the time specified we will take this offer off the table and file a TRO that afternoon and stop Adrenaline RUSH from reaching the marketplace. You should expect substantial publicity to be wrapped around such an event and continue up through the Federal Court's decision to permanently enjoin South Beach Beverage Company from bringing Adrenaline RUSH to market.

(Battersby Decl. Ex. D.)

Following negotiation, South Beach LLC and R.J. Corr entered into an agreement (the "Consent Agreement") effective September 29, 2000. (*Id.* ¶ 11.) The Consent Agreement stated that "the parties acknowledge that they do not foresee any likelihood of confusion between Corr Marks and the South Beach Mark if measures specified hereunder are followed only because of the differences between the marks and how they are and will be presented." (Def.'s 56.1 Ex. B.) Paragraphs 1 and 2 of the Consent Agreement provided as follows.

> 1. In consideration for the payment by South Beach of good and valuable consideration [namely, $30,000.00], the receipt and sufficiency of which is acknowledged by Corr, Corr perpetually consents to the use and registration by South Beach of the mark SOBE ADRENALINE RUSH for beverage products as well as for its use in any promotional and advertising material relating thereto.

> 2. South Beach agrees that its house mark SOBE will always be used in combination with the words ADRENALINE RUSH. It shall not use the word "Rush" on any beverage product in any other form without the prior express written permission of Corr.

(Def.'s 56.1 Ex. B.) R.J. Corr agreed "never to use or license others to use the mark 'Rush' in combination with the words Adrenaline or SOBE in connection with beverage products." (*Id.* ¶ 14.) Paragraph 4 of the Consent Agreement provided that "Corr will refrain from taking any legal action or initiat[ing] any other legal proceedings that would hinder South Beach in its free and unfettered use and registration" of the "SoBe Adrenaline Rush" mark. (*Id.* ¶ 15.)

Paragraph 6 of the Consent Agreement contains an integration clause, which provides that:

> This Agreement contains the entire understanding of the parties and all prior discussion, understanding, representations and agreements, whether oral or in writing, between the parties are superseded and merged into this Agreement, which alone fully and completely expresses their agreement. This Agreement shall inure to the benefit of Corr's successors and assigns. South Beach shall not have the right to assign this Agreement or any of its rights underunder [sic] without Corr's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, South Beach may assign this Agreement or any of its rights hereunder, without Corr's prior written consent, to a purchaser of South Beach or its product line including the trademark and good will associated therewith, or to an entity that controls, is controlled by, or is under common control of South Beach. Any assignee of South Beach shall agree, in writing, to be bound by the terms of this Agreement prior to any assignment becoming effective.

(Def.'s 56.1 Ex. B ¶ 6.) The integration clause was added to the Consent Agreement at the request of Tom Swan, Corr's business partner. (Battersby Decl. ¶ 12.) South Beach LLC assigned its rights under the Consent Agreement to South Beach, its successor in interest. (Def.'s 56.1 ¶ 17.) R.J. Corr assigned its rights under the Consent Agreement to RBC. (Def.'s 56.1 ¶ 18.) South Beach delivered a check in the amount of $30,000.00 to R.J. Corr, as required by Paragraph 1 of the Consent Agreement, on or about October 3, 2000. (*Id.* ¶ 19.)

In November 2000, South Beach launched the "SoBe Adrenaline Rush" energy drink in the United States. (*Id.* ¶ 20.) South Beach has always displayed the "SoBe Adrenaline Rush" mark in its entirety on the product itself, on packaging, and on marketing and advertising materials. (*Id.* ¶ 21.) On cans of the beverage, the "SoBe Adrenaline Rush" mark is displayed thus. The word "SoBe" followed by the registered trademark symbol (an uppercase "r" in a circle) sits above the word "adrenaline" in lowercase letters. (Def.'s 56.1 Ex. D.) The word "rush" sits below both "SoBe" and "adrenaline". (*Id.*) The word "adrenaline" is printed in large and more distinctive type than either "SoBe" or "rush". (*Id.*) The word "rush" is in larger type than "SoBe" but is of the same color and type as "SoBe". (*Id.*) The words "SoBe", "adrenaline" and "rush" are either printed over the

"Battling Lizards" logo or under it. (*Id.*) The worldwide web address is displayed thus: "sobeadrenalinerush.com" with the word "adrenaline" in a different color than the words "SoBe" and "rush". (*Id.*)

PepsiAmericas is a bottling company headquartered in Chicago, Illinois. (Def.'s 56.1 ¶ 22.) PepsiAmericas supplied beverages, including "SoBe Adrenaline Rush", to the Illinois Restaurant Association during the 2001 Taste of Chicago Festival. (*Id.* ¶ 23.) The booth in question was independently designed, set up and operated by the Illinois Restaurant Association. (*Id.* ¶ 23.) The Illinois Restaurant Association arranged for the design and display of the menu board, which displayed the "SoBe Adrenaline Rush" thus: the "SoBe" logo (the word "SoBe" underscored atop the "Battling Lizards" logo) to the left of the words "Adrenaline Rush", which are below "8 oz. Serving" and "7 Tickets". *See* Figure 1.



## DISCUSSION

### *Count A*

South Beach argues that summary judgment is appropriate on Count A because (1) fraud claims should be dismissed if they duplicate claims for breach of contract, (2) RBC cannot prove that South Beach was under a duty to disclose any facts allegedly concealed, and (3) RBC cannot prove that it reasonably relied on any alleged representation made by South Beach.

Count A requests a declaration that the Consent Agreement is void as a result of the allegedly fraudulent actions of South Beach and its legal representatives to induce RBC to enter into the Consent Agreement. Count A alleges that South Beach made the following false and fraudulent misrepresentations: (1) that the mark "SoBe Adrenaline Rush" would only be used in that form, (2) that South Beach would always use the house mark "SoBe" in combination with the words "Adrenaline Rush"; (3) that South Beach would pay a small fee because its use would be minor; (4) that the product line for which the mark "SoBe Adrenaline Rush" would be used would be small when South Beach knew that the product would become one of its major and best-selling products; (5) that South Beach concealed that it was selling its business to Coca-Cola, Inc. or Pepsico, Inc.; and (6) that the product was not to be distributed nationwide immediately. (Am. Compl. ¶ 10.)

In order to prevail on its claim that South Beach and its legal representatives fraudulently induced Corr to sign the Consent Agreement, RBC must prove, by clear and convincing evidence, that: (1) South Beach made a false statement of material fact; (2) South Beach knew that the statement was false; (3) South Beach intended to induce RBC in reasonable reliance on the truth of the statement; and (4) RBC suffered damages as a result of its reliance on South Beach's statement. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).

RBC has not presented any evidence, besides an affidavit of Corr, that such statements were made. However, even if RBC could prove that such statements had been made, "the failure to perform a contractual promise, even when the promise is made with an intent not to perform[,] does not constitute common law fraud." *Nat'l Wrecking Co. v. Midwest Terminal Corp.*, 234 Ill. App. 3d 750, 764 (1992). Therefore, any fraud claims based on South Beach's failure to use the mark "SoBe Adrenaline Rush" in a particular form or to use the house mark "SoBe" in combination with "Adrenaline Rush" must fail.

RBC also claims that South Beach concealed the fact that South Beach was for sale during the negotiation of the Consent Agreement. In order to prevail on a claim for fraudulent concealment, RBC must prove "that [South Beach] concealed a material fact when [it] was under a duty to disclose that fact to" RBC. *Connick*, 174 Ill. 2d at 500 (citations omitted).

A duty to disclose arises "if plaintiff and defendant are in a fiduciary or confidential relationship . . . [or] out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. . . . This position of superiority may arise by reason of friendship, agency, or experience." *Connick*, 174 Ill. 2d at 500 (internal citations omitted).

RBC has not presented any evidence that would prove that South Beach was under a duty to disclose the fact allegedly concealed. The evidence presented does not establish the existence of a fiduciary or confidential relationship between RBC and South Beach. Rather, the evidence presented establishes that: Corr initiated the sale of a license memorialized in the Consent Agreement by sending a cease and desist letter to South Beach; the parties negotiated at arms' length; Corr had been in the soft drink business since 1978 and had executed licenses with companies such as the

-9-

Quaker Oats Company, BCB Beverages/Cott and National Beverage Corporation; and that Corr sent South Beach's counsel the draft license that, after a course of negotiations, became the Consent Agreement. South Beach was under no duty to disclose that it was for sale when it negotiated the license with RBC. Therefore, RBC cannot prevail on its claim for fraudulent concealment.

Finally, RBC claims that South Beach fraudulently induced RBC to sign the Consent Agreement by allegedly stating that it would only make minor use of the "SoBe Adrenaline Rush" mark, that the product would be test-marketed before being sold nationwide, and that the fee paid to RBC would, therefore, be small when South Beach knew that "SoBe Adrenaline Rush" would become one of South Beach's best sellers.

As was noted earlier, other than an affidavit from Corr, RBC has not presented any evidence that such statements were indeed made. Further, the Consent Agreement contained an integration clause, paragraph 6, set out above, which precludes the introduction of any other agreement on the subject matter of the terms of the license.

The evidence establishes that the alleged oral misrepresentations are inconsistent with the Consent Agreement that was negotiated between the parties and that the integration clause was actually inserted at the request of Corr's business partner. "If a literate, competent adult is given a document that in readable and comprehensible prose says X . . . and the person who hands it to him tells him, orally, not-X . . . , our literate, competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. Cigna Secs., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996).

Furthermore, even if not barred by the integration clause, RBC cannot maintain its fraud claim against South Beach based on alleged future conduct by South Beach because an "alleged misrepresentation must . . . relate to a past or present fact, not a future or contingent event," except

-10-

where the misrepresentation is part of a "scheme to defraud". *Bensdorf & Johnson*, 58 F. Supp. 2d at 881 (citing *Razdan v. General Motors Corp.*, 979 F. Supp. 755, 759 (N.D. Ill. 1997)). To take refuge in the "scheme to defraud" exception, a plaintiff must allege and prove, in addition to the intentional misrepresentation, "that defendant intended to induce plaintiff to act for defendant's benefit in reliance on the misrepresentation." *Bensdorf & Johnson*, 58 F. Supp. 2d at 881 (citations omitted). RBC has not presented any evidence that would suggest that South Beach intended to induce it to act for South Beach's benefit in reliance on the alleged misrepresentation. Rather, the evidence presented establishes that Corr, a business man in the soft drink industry since 1978 who has negotiated licensing agreements with other companies, sought out South Beach and presented it with a draft licensing agreement.

Therefore, Defendants' Motion for Summary Judgment is granted as to Count A.

### Count B

South Beach argues that summary judgment is appropriate on RBC's breach of contract claim (Count B). In order to establish a breach of contract claim under Illinois law, RBC must prove "'(1) the existence of a valid and enforceable contract; (2) the performance of the contract by [RBC]; (3) the breach of the contract by [South Beach]; and (4) a resulting injury to [RBC].'" *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 1998) (quoting *Hickox v. Bell*, 195 Ill. App. 3d 976, 992 (1990)).

The terms of the contract required South Beach (1) to use its house mark "SoBe" "*in combination with* the words ADRENALINE RUSH" and (2) not to use the word "'Rush' on any beverage product in *any other form* without the prior express written permission of Corr." (Def.'s 56.1 Ex. B ¶¶ 1, 2) (emphasis added). South Beach argues that the display of the "SoBe Adrenaline

Rush" mark on the menu Board at the 2001 Taste of Chicago Festival complied with the Consent Agreement because the words "SoBe", "adrenaline" and "rush" were displayed together. South Beach also argues that it was not responsible for the menu board and that the company which was responsible was not its agent.

Breach of contract is a state law claim. Therefore, Illinois law governs. Contract interpretation is a question of law. *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 524 (2002). The goal of contract construction is to determine and give effect to the parties' intent at the time of contracting. *Shields Pork Plus, Inc. v. Swiss Valley AG Serv.*, 329 Ill. App. 3d 305, 310 (2002). "If there is no ambiguity, the interpretation of the contract is a question of law to be determined solely from the terms of the contract itself," *M.H. Detrick Co. v. Century Indemnity Co.*, 299 Ill. App. 3d 620, 625 (1998), and the words are to be given their common and accepted meaning. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310. Whether a contract is ambiguous is a question of law. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 311.

The parol evidence rule "'precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify'" the contract's terms. *Krautsack v. Anderson*, 329 Ill. App. 3d 666, 680 (2002) (quoting *Eichengreen v. Rollins*, 325 Ill. App. 3d 517, 521-22 (2001)). Parol or extrinsic evidence may not be considered unless the writing is incomplete or ambiguous. *Krautsack*, 329 Ill. App. 3d at 680.

"A court may only consider the writing itself in determining whether a contract is complete and integrated," that is, "the document [was] 'intended to be a final and complete expression of the entire agreement.'" *Krautsack*, 329 Ill. App. 3d at 680-81 (quoting *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 246 Ill. App. 3d 523, 528 (1993)).

> If [the document] imports on its face to be a complete expression of the whole agreement, - - that is, contains such language as imports a complete legal obligation, - - it is to be presumed that the parties introduced into it every material item and term, and parol evidence cannot be admitted to add another term to the agreement.

*Krautsack*, 329 Ill. App. 3d at 680-81 (quoting *Eichengreen*, 325 Ill. App. 3d at 523). However,

"'the presence of a merger clause is strong evidence that the parties intended the writing to be the

complete and exclusive agreement between them.'" *Regensburger v. China Adoption Consultants,*

*Ltd.*, 138 F.3d 1201, 1206 (7th Cir. 1998) (quoting *L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*,

9 F.3d 561, 569 (7th Cir. 1993)); *see also Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457,

464 (1999) (noting that "where parties formally include an integration clause in their contract, they

are explicitly manifesting their intention to protect themselves against misinterpretations which

might arise from extrinsic evidence").

The parties manifestly intended the Consent Agreement to be the complete and exclusive

agreement between them. The Consent Agreement contains all the essential terms of the agreement

and the respective duties of the parties under the agreement. The Consent Agreement also contains

an integration clause, which states that "[t]his Agreement contains the entire understanding of the

parties and all prior discussion, understanding, representations and agreements, whether oral or in

writing, are superseded and merged into this Agreement, which *alone fully and completely expresses*

*their agreement*." (Def.'s 56.1 Ex. B ¶ 6) (emphasis added). The integration clause was added at the

request of Tom Swan, Corr's business partner, and not Battersby.

> The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. . . . An integration clause such as the one in the present case is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. [RBC] was free to negotiate a contract omitting the integration clause. It did not, and it is bound by its bargain.

*Air Safety, Inc.*, 185 Ill. 2d at 464-65.

RBC argues that South Beach has not complied with the Consent Agreement because the terms "in combination with" and "any other form" required the "SoBe Adrenaline Rush" mark to be used "always as a 'unitary' mark, always bold, always on the same line and always in letters of equal size and height and only in [the] 'form'" "SoBe Adrenaline Rush". (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 8.) RBC argues that its interpretation of these terms is based on representations made by Battersby to Corr during the course of negotiating the Consent Agreement. RBC argues that consideration of extrinsic evidence, Battersby alleged representations during negotiation, is appropriate because the terms "in combination with" and "in any other form" are ambiguous.

A contract term is ambiguous "'when the language used is susceptible to more than one meaning . . . or is obscure in meaning through indefiniteness of expression . . . .'" *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310 (quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)). However, a disagreement between the parties as to how to interpret the contract terms does not render the terms ambiguous. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310.

The term "in combination with" is not ambiguous. The term is not susceptible to more than one meaning. A "combination" is defined as "the result or product of combining[;] a union or aggregate made by combining one thing with another." Webster's Third International Dictionary 452 (3d ed. 1986). "Combine" is defined as "to bring into close relationship." Webster's Third International Dictionary 452 (3d ed. 1986). Giving the terms their common and accepted meaning, "in combination with" means "in union made by bringing into close relationship with".

The term "in any other form" is also not ambiguous. The term is not susceptible to more than

one meaning. "Any" can be defined as "one, no matter what one[;] every."[2] Webster's Third International Dictionary 97 (3d ed. 1986). "Other" can be defined as "not the same[;] different." Webster's Third International Dictionary 1598 (3d ed. 1986). "Form" can be defined as "one of the different modes of existence, action, or manifestation of a particular thing or substance[;] kind, modification, species, variety." Webster's Third International Dictionary 892 (3d ed. 1986). The term "in any other form" is construed as "in every different manifestation".

Because the Consent Agreement is complete and integrated and contains no ambiguous terms, no parol evidence will be allowed to establish the terms of prior agreements.

Nothing in the common or accepted meaning of the phrase "in combination with" suggests that the word "SoBe" must immediately precede "Adrenaline Rush" or be on the same line and in letters of equal height and size. Rather, the word "SoBe" merely had to be used in close relationship with the words "Adrenaline Rush". This was accomplished by the menu board at the 2001 Taste of Chicago Festival that displayed the "SoBe" logo in close relationship with the words "Adrenaline Rush" as described above.[3]

Finally, the menu board at the 2001 Taste of Chicago complied with the requirement that

---

[2]The word "any" also has different meanings. But those meanings would render the contract provision nonsensical.

[3]RBC's brief directs the Court's attention to other instances in which it believes that South Beach is breaching the Consent Agreement, namely at SoBe's website. However, these alleged breaches were not alleged in the Amended Complaint and are not properly before the Court. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Even if these other instances were considered, RBC has not attached any evidentiary support for these allegations as required by Local Rule 56.1. South Beach, however, has attached several examples of its use of the contested marks as required by the Consent Agreement.

South Beach not "use the word 'Rush' on any beverage product in any other form." The term "in any other form" does not require South Beach to use the mark only where "SoBe" immediately precedes "Adrenaline Rush" on the same line and in letters of the same height and size. South Beach was merely required to use the words "SoBe" in close relationship with "Adrenaline Rush". As long as the words "SoBe", "adrenaline" and "rush" are in close relationship with each other, it does not matter, under the Consent Agreement, whether they are on different lines or of letters of different sizes or heights. Being on different lines or of letters of different sizes or heights does not violate the requirement that South Beach not use "Rush" "in any other form" because the Consent Agreement itself does not require the "SoBe Adrenaline Rush" mark to be on the same line or composed of letters of the same size and height.

Therefore, Defendants' Motion for Summary Judgment is granted as to Count B.

### Counts C, D, and E

Defendants argue that summary judgment is appropriate on RBC's claims for common law trademark infringement (Count C) and violations of the Illinois Deceptive Trade Practices Act and Consumer Fraud and Deceptive Business Practices Act (Count D) and section 43(a) of the Lanham Act (Count E) because, under the Consent Agreement, RBC has "perpetually consent[ed] to the use and registration by South Beach of the mark SOBE ADRENALINE RUSH for beverage products as well as for its use in any promotional and advertising material relating thereto." (Def.'s 56.1 Ex. B ¶ 1.) Thus, Defendants argue, Counts C through E are barred by the Consent Agreement. It should also be noted that under the Consent Agreement, RBC agreed that it would "refrain from taking any legal action or initiate any other legal proceedings that would hinder South Beach in its free and unfettered use and registration" of the mark "SoBe Adrenaline Rush". (Def.'s 56.1 Ex. B

¶ 4.)

RBC argues that Paragraph 4 is not enforceable because the Consent Agreement is unconscionable. In support of its position, RBC directs the Court to section 2-302(1) of the Uniform Commercial Code ("UCC"), 810 Ill. Comp. Stat. 5/2-302 (2002). The UCC does not apply to the Consent Agreement because the transaction did not involve the sale of goods. *Berthold Types Ltd. v. Adobe Sys., Inc.*, 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000). "[A]n agreement that does not involve a transfer of title cannot be an Article 2 sale in Illinois. A 'sale' is defined as 'the passing of title from the seller to the buyer for a price.' A pure license agreement . . . does not involve transfer of title, and so is not a sale for Article 2 purposes." *Berthold Types Ltd.*, 101 F. Supp. 2d at 698 (quoting *Luwinski v. Stone Container Corp.*, 312 Ill. App. 3d 385, 389 (2000)).

An unconscionable contract is one "'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man could accept, on the other.' . . . An unconscionable contract is usually improvident, wholly one-sided or oppressive." *Dillman & Assocs., Inc. v. Capitol Leasing Co.*, 110 Ill. App. 3d 335, 341 (1982) (quoting *Neal v. Lacob*, 31 Ill. App. 3d 137, 142 (1975)). However, the unconscionability doctrine will not be used "to rewrite the terms of contracts into which educated businessmen have entered." *Dillman & Assocs.*, 110 Ill. App. 3d at 341. When determining whether a contract is unconscionable, a court will consider whether the contract gives rights and duties to both parties, whether the contract's provisions favor one party over the other, and whether the parties were of equal bargaining power. *Dillman & Assocs.*, 110 Ill. App. 3d at 342.

The parties were of equal bargaining power. While Corr was a layman, Corr had been involved in the beverage industry since 1978 and had negotiated several licensing agreements with

-17-

other businesses. Corr was free to seek representation by an attorney to negotiate on his behalf but chose not to do so. Moreover, Corr threatened South Beach that "SoBe Adrenaline Rush" would never reach the market (due to trademark litigation he would initiate) if it did not negotiate a license with him. The evidence presented establishes that there is no genuine dispute of material fact that the parties were of equal bargaining power.

The Consent Agreement gives both parties rights and duties and does not favor one party over another. South Beach agreed to pay Corr $30,000.00 to use the house mark in combination with the "Adrenaline Rush" mark and not to use the word "Rush" on any beverage product in any other form. Corr agreed not to use or license others to use the word "Rush" in combination with "adrenaline" or "SoBe" and not to take any legal action that would hinder South Beach in its use of the mark "SoBe Adrenaline Rush". However, under the Consent Agreement, Corr remained free to license the use of the word "Rush" to others. Therefore, the Consent Agreement is not unconscionable and is enforceable.

Generally, covenants not to sue are enforceable in Illinois. *See Sanjuan v. Am. Bd. Psychiatry & Neurology, Inc.*, 40 F.3d 247, 249 (7th Cir. 1994). As was noted above, RBC agreed, under the Consent Agreement, not to take any legal action that would hinder South Beach in its free use of the "SoBe Adrenaline Rush" mark. The Consent Agreement also states that the parties did not foresee any likelihood of confusion between their respective marks if there was compliance with the Consent Agreement.

> [A] party entering into a . . . [contract] with respect to a trademark will be held to his contract unless enforcement of the contract would result in injury to the public through confusion. . . . First, the party seeking rescission must show that enforcement of the contract will create confusion that will cause harm to the consuming public, as opposed to mere harm to a party's business. . . . If the party makes this showing,

the court must then weigh this confusion and resulting harm against contract law's policy of holding parties to the terms of their agreements, in order to determine whether enforcement of the contract ultimately violates public policy.

*Proriver, Inc. v. Red River Grill, LLC*, 83 F. Supp. 2d 42, 45-46 (D.D.C. 1999) (footnotes, quotation marks, and internal citations omitted).

RBC has not presented any evidence that the public has been or would be injured if the Consent Agreement were enforced. RBC has not presented any evidence that any consumer has actually been confused as to who is the maker of "SoBe Adrenaline Rush". Moreover, even if a consumer were to purchase "SoBe Adrenaline Rush" under the mistaken belief that it was an RBC product, there is no risk of significant harm to the public because there has been no evidence presented that South Beach's product is inferior. *Proriver, Inc.*, 83 F. Supp. 2d at 48. Moreover, any consumer who bought "SoBe Adrenaline Rush" thinking it was RBC's product would be quickly disabused of that notion by the packaging and labels. The possibility of consumer confusion does not outweigh the public policy in favor of freedom of contract. *See Rayner Covering Sys., Inc. v. Danvers Farmers Elevator Co.*, 226 Ill. App. 3d 507, 512 (1992) (noting that the basis of enforcement of exculpatory clause is the strong public policy favoring freedom of contract). Thus, paragraph 4 of the Consent Agreement is enforceable.

Paragraph 4 bars RBC from taking any legal action or initiating legal proceedings that would hinder South Beach's use of the "SoBe Adrenaline Rush" mark. Counts C, D, and E are such legal proceedings. Thus, Counts C, D, and E are barred by paragraph 4. Therefore, Defendants' Motion for Summary Judgment is granted as to Counts C, D, and E.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is granted as to all counts of Plaintiff's complaint.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: December 5, 2002